ÁNGELA FIGUEROA ET AL., Plaintiffs and Appellants, v. MU-NICIPALITY OF SAN JUAN (GOVERNMENT OF THE CAPITAL OF PUERTO RICO), Defendant and Appellee.

No. R-67-157.    Decided February 11, 1970.

---

*Inés Acevedo Campos* and *Raúl Matos* for appellants. *Rodolfo F. Aponte\** for appellee.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

—I—

*Grounds for the Action*

(1) By deed No. 4 executed before notary M. Alberto Salicrup, on January 9, 1922, in Ponce, there appeared Enrique Adsuar Boneta by himself and as proxy for his wife Rosario Miró; Luis de la Cruz Santiago as proxy for his sister Rita de la Cruz Santiago; Casimiro Figueroa Reyes; Sandalio Torres Monge as proxy for his wife Ángela Figueroa Reyes; José Víctor Figueroa Reyes; Juan Figueroa Reyes; Ángel Figueroa Reyes married to María Siuró Renta, and proceeded to the division among themselves of the property known as "El Reloj", situated at the Ward Santurce and which belonged to Ramón Figueroa and his wife Carmen

---

\* He waived said legal representation on December 30, 1968, after having submitted the case on the merits on September 29, 1967.

Reyes Arroyo, as it appears in their testamentary documents, recorded with the No. 1824 at folio 82 on the back of Volume 64 of San Juan, 13th entry.

(2) The property was described as having a total area of 96 cuerdas, 2,732 square varas with its respective boundaries on its cardinal points.

(3) By virtue of the mentioned testamentary documents and certain acquisitions made from other heirs, the appearing parties became owners of said property, in certain shares which it is not necessary to detail now.

(4) In said deed No. 4 the appearing parties stated that when they made the material division they had determined, "for the improvement of the property in benefit of everyone," several streets and a recreation square which were described in their extension and trajectory. To the effects of this action the following should be mentioned:

(a) "Del Rosario" Street with an East to West trajectory crossing streets "José Ramón Figueroa", "Labra" and "Condado", with a width of 12 meters and a superficial area of 3661.80 square meters;

(b) "Corchado" Street with an East to West trajectory crossing streets "José Ramón Figueroa", "Labra" and "Condado", with a width of 12 meters and a superficial area of 3331.20 square meters.

(c) "Labra" Street from North to South and "José Ramón Figueroa" Street with the same trajectory from North to South, both departing from Ponce de León Avenue.

(5) The parcel of land devoted to the "Recreation Square" was located between "Del Rosario" Street which bounded it on the North, "Labra" Street on its West, "Corchado" Street on its South and on the East it was bounded by lands adjudged to Rita de la Cruz in the same deed of partition. It was stated that it had a superficial area of 4,500 meters, with an extension on the North of 60 meters 4 centimeters along "Del

Rosario" Street; on the South 52 meters 6 centimeters along "Corchado" Street; on the West 76 meters 33 centimeters along "Labra" Street and on the East 74 meters 8 centimeters on its boundary with Rita de la Cruz.

(6) Insofar as this action is concerned, and in payment of their respective shares, Rita de la Cruz Santiago was adjudged a parcel with a superficial area of 8,542.86 square meters, bounded on the North along a distance of 114 meters 75 centimeters by the now Fernández Juncos Avenue; on the West along 78 meters 22 centimeters by "Labra" Street; on the South along 106 meters 43 centimeters by "Del Rosario" Street and on the East along 76 meters 20 centimeters by "José Ramón Figueroa" Street.

(7) Insofar as this action is also concerned the same Rita de la Cruz Santiago was adjudged another parcel with a superficial area of 3,200.72 square meters bounded on the North by "Del Rosario" Street along a distance of 46 meters 16 centimeters; on the West bounded by the "Recreation Square" described in the foregoing paragraph (5) along a distance of 74 meters 8 centimeters; on the South by "Corchado" Street along a distance of 44 meters 16 centimeters and on the East by "José Ramón Figueroa" Street along a distance of 72 meters 38 centimeters. *SEE THE ILLUSTRATION:*

(\*\*\*) Consolidation, segre-
gation, sale. Deeds
Nos. 6 and 12, 1928
and 1929.

—II—

## The Issue

(8) On December 11, 1962 appellants by themselves and representing the heirs, successors in interest, and assignees of the persons who on January 9, 1922 were the owners of the property "El Reloj" and who divided it according to deed No. 4 described in the foregoing paragraph (1), filed a complaint against the Government of the Capital pursuant to

528

Rule 20.1 of the Rules of Civil Procedure.[1] They attached as Annex A to said complaint a statement which contains the names of all the heirs, successors in interest, or assignees of the owners of the said property according to deed No. 4, 71 persons as a whole, and it was stated that appellant Ángela Figueroa Reyes was the only co-owner of the property still living.

(9) It was alleged in the complaint that the appellants, as heirs, successors in interest, and assignees of the original owners of the property, paragraphs (1) and (3), were co-owners of the undivided property of the parcels described in the deed of partition as "Del Rosario" Street and "Recreation Square"; that under the pretext of having acquired said parcels by grant according to the said deed No. 4 of January 9, 1922, the Government of the Capital had issued Certificate No. 465 of April 7, 1958 to obtain the unlawful recording in its name of (a) part of "Del Rosario" Street with an area of 1212.9462 square meters which was recorded at Folio 103 of Volume 151 of Santurce South, property No. 4885, 1st entry; and (b) part of the parcel described as "Recreation Square" with an area of 3735.7278 square meters, which was recorded at folio 102 of volume 151 of Santurce South, property No. 4884, 1st entry; all this without the consent or intervention of the legitimate owners.

---

[1] Angela Figueroa Reyes, Alejandro and Carmen Figueroa Maldonado, Carmen Figueroa Collazo, Carlos A. Figueroa Camacho, Roberto and Manuel Figueroa García, Ernesto and Emigdio Figueroa Ortiz, Rafael and José Ángel Figueroa Ciuro appeared as plaintiffs all *by themselves* and in representation and on behalf of Rosario Miró Widow of Adsuar, and of all the members and assignees of the heirs of José Víctor Figueroa Reyes, Juan Figueroa Reyes, Casimiro Figueroa Reyes, Ángel Figueroa Reyes, Enrique Adsuar, Luis de la Cruz and his wife Rosa Figueroa Reyes, Lydia Figueroa Ortiz, Juan Figueroa Rivera. The plaintiffs alleged that their appearance in the action insures an adequate representation of all the persons mentioned in the Annex A and a common relief for all is sought. See Rule of Civil Procedure 20.1.

(10) It was alleged that unlawfully and by deed No. 17 executed in San Juan on June 4, 1958, before notary Margarita Landrau, the Government of the Capital consolidated the said two parcels with some others to create another property with a superficial area of 12,019.4567 square meters bounded on the North by lands belonging to the Texaco Service Station, Blanco Auto Service, and J. J. Gerardino; on the South by "Corchado" Street; on the East by "Figueroa" Street and on the West by "Labra" Street, property which was recorded at Folio 134 Volume 151 of Santurce South with the number 4891. They alleged that said recording and its consolidations are void because the Municipality of San Juan does not have any title to said parcels.

(11) As a second cause of action appellants alleged that by ordinances No. 84 of 1956–57 and No. 33 of 1957–58 concerning the "Recreation Square" and part of "Del Rosario" Street, the Municipality of San Juan unlawfully came into the possession of the said parcels, in bad faith and without a just title over them and has derived civil fruits.

(12) As a third cause of action appellants alleged that the Government of the Capital has sought to sell the consolidated property of 12,019.4567 square meters, and that to subserve said conveyance it obtained the approval of Act No. 9 of May 15, 1962 dispensing with the requirement of auction; and that the Municipality lacks authority to sell, with or without auction, the said property.

(13) Appellants requested the nullity and cancellation in the Registry of the recordings in favor of the Government of the Capital concerning said parcels "Recreation Square" and "Del Rosario" Street; the nullity of the aforementioned deed of consolidation No. 17 of June 14, 1958 as well as the nullity of the Certificate of the Municipality of San Juan No. 465 of April 7, 1958; and requested the court to order the Municipality of San Juan to deliver to appellants and the persons

represented by them said two parcels with the reimbursement of the fruits derived since 1956 to 1957 and interest, and to prohibit the Municipality to alienate said property. Appellants also requested that since a "class action" was involved, the court should fix their attorney's fees.

(14) The complaint was denied and the parties signed a stipulation by virtue of which they submitted the documentary evidence which should be accepted as evidence of both parties or as evidence of one of them. Among such evidence there appears certain proofs about Civil Action R-5777 before the then District Court of San Juan by Ángela Figueroa Widow of Torres Monge by herself and in representation of others of her class, against the Government of the Capital about "Compensation and Damages."

(15) The parties stipulated that the description of the "Recreation Square" and of the part of "Del Rosario" Street in litigation were the results of the first fact—letters "B" and "C", respectively—of deed No. 17 executed on June 4, 1958, before notary Margarita Landrau, except that the plaintiffs allege that part of the land south of "Del Rosario" Street belongs to them and not to the Government of the Capital, for which reason they should appear as boundaries on the South.[2] Likewise they stipulated that the exact area of the parcel in litigation would be determined by a survey and *marking of boundaries subsequent* to the judgment in case that the judgment rendered in the action was favorable to plaintiffs-appellants.

(16) They also stipulated that a series of official acts and recordings, which they detailed, including the consolidation made by deed No. 17 of June 4, 1958 to create property

---

[2] In this deed the "Recreation Square" was described with an area of 3735.7278 square meters and the part of "Del Rosario" Street with an area of 1212.9462 square meters. The part of "Del Rosario" Street in litigation is the block located between "Labra" Street and "José Ramón Figueroa" Street.

No. 4891, all which refer to certain parcels of land identified and described in different manners and with different areas, comprise among them the portion of "Del Rosario" Street claimed in the complaint, as well as the "Recreation Square."

(17) Finally they stipulated that the portion of "Del Rosario" Street in litigation and the "Recreation Square" were devoted to the same public use to which they were devoted when the judgment in case R-5777 was rendered in the year 1948, and until the date on which the same were withdrawn from public use by the Municipality of San Juan in the year 1957.

(18) With this stipulation and the documentary evidence offered and a brief oral testimony by witness Ernesto Figueroa with respect to the fact that the persons mentioned in Annex A of the complaint were the heirs, successors in interest or assignees of the original owners of the property, the case was submitted. From the documentary evidence in the record the following facts appear:

i. By deed No. 159 of December 12, 1923, executed in Ponce before notary Felipe Colón Díaz, Luis de la Cruz Santiago and his wife Rosa Figueroa Reyes acquired from Rita de la Cruz Santiago the parcels of 8,542.86 sq/m and 3,200.72 sq/m adjudged to the latter, described in the foregoing paragraphs (6) and (7) marked "A" and "B" in the *Drawing*. These properties were recorded in favor of spouses De la Cruz-Figueroa Reyes in the Registry of Property.

ii. By deed No. 6 executed in San Juan on January 16, 1928 before notary José Martínez Dávila, Luis de la Cruz and his wife Rosa Figueroa Reyes segregated from parcel "A" of 8,542.86 sq/m a portion of 5,313.44 sq/m bounded on the North along 110.59 meters by the principal property from where it is segregated; on the East along 48.20 meters by "José Ramón Figueroa" Street; on the South along 46.16 meters first by Luis de la Cruz himself (Parcel "B") of

3,200.72 sq/m and second, along 60.04 meters by the Municipality of San Juan (Recreation Square).

iii. By the same deed No. 6 spouses De la Cruz-Figueroa stated that the foregoing segregated parcel was adjacent to the other one "B" belonging to them of 3,200.72 sq/m and that as both make up one sole body, they proceeded to consolidate them in a different one which they described as having 8,530 sq/m [8,514.16 sq/m] bounded on the North along 110.59 meters by the principal property; on the South along two alignments in the shape of hammers from East to West, the first in 44.16 meters adjacent to "Corchado" Street, and the second of 60.04 meters adjacent to the "Recreation Square"; on the East along 120.58 meters by "José Ramón Figueroa" Street; and on the West in two alignments in the shape of hammers from South to North, the first of 74.08 meters adjacent to the "Recreation Square" and the second of 38.22 meters adjacent to "Labra" Street.

iv. Thus consolidated in one sole property spouses De la Cruz-Figueroa sold this portion of 8,530 [8,514.16] square meters to the Municipality of San Juan at the unit price of $6.00 per square meter and for a total of $51,180.

v. The foregoing purchase was authorized by Resolution No. 365 of the Municipality of San Juan in 1928, as amended by Resolution No. 372 of the same year. Notwithstanding the foregoing, by a subsequent Ordinance No. 72 of June 27, 1929 an identical acquisition was authorized, and deed No. 12 of August 15, 1929 was again executed before notary Edelmiro Martínez Rivera, the Municipality acquiring the same property, no reference to or mention of Resolution No. 365 or of the previous deed No. 6 having been made in Ordinance No. 72 or in this deed. In the declaration of policy of Ordinance No. 72 it is stated that Luis de la Cruz made a donation to the Municipality of San Juan and that the latter had accepted the parcel of 4,500 sq/m (Recreation Square)

adjacent to this property. There is nothing in the evidence submitted which establishes that Luis de la Cruz or his wife Rita Santiago were owners at any former time of the parcel "Recreation Square" allegedly donated by him to the Municipality.

vi. It undoubtedly arises from the foregoing deed No. 6 executed before notary Martínez Dávila, and later from deed No. 12 executed before notary Edelmiro Martínez Rivera, that the segregation and consolidation performed therein included the portion of "Del Rosario" Street between "José Ramón Figueroa" and "Labra" Streets, despite the fact that this portion had been separated for a street by the deed No. 4 of 1922 of material division of the property "El Reloj", and that said portion was not adjudged therein to any of the coparticipants.

vii. The evidence in the record does not contain the entries in the Registry to this respect, nor the area of the remaining part of the principal property—Parcel "A" of the *Drawing*—from where the segregation was made. Under these circumstances we are not in a condition to determine whether or not in acquiring title over this property thus consolidated the Municipality was a third party according to the Registry, and in absence of other evidence, whether or not it was a third civil party in good faith insofar as the title over the portion comprised by "Del Rosario" Street not adjudged to the person from whom the Municipality acquired it, is involved.

viii. It is a fact, concerning said portion of street which is one of the two properties in litigation herein, that the Municipality's title apparently does not originate from the subdivision of lands for streets—"Del Rosario" Street—in deed No. 4 of January 9, 1922, but from deeds Nos. 6 of January 16, 1928, and 12, of August 15, 1929; subject to the impeachments which there might be against said title if the Municipality had not been a protected third party.

ix. By Ordinance No. 85 of June 5, 1957 the City Manager was authorized to hold public hearings to withdraw from public use the part of "Del Rosario" Street between "José Víctor Figueroa" and State Highway No. 2 (Labra). It is stated in the Declaration of Policy that said part has always been consolidated with and was part of a lot of the Municipality and that said Street *had never been used as a thoroughfare.* By Ordinance No. 33 of August 7, 1957 said part of "Del Rosario" Street was withdrawn from public use.

x. On December 18, 1957 the Planning Board rendered Report No. 58-P-833 about the consolidation of lands of the Government of the Capital, which as amended by another of January 22, 1958 authorized the consolidation of Parcel "B" from the foregoing *Drawing* with the remaining of Parcel "A" after the segregations for Garage Texaco, Blanco Auto Service, and J. J. Gerardino; with the portion of "Del Rosario" Street between "Figueroa" and "Labra" Streets, and with the parcel "Recreation Square." The consolidated property was described as a parcel with an area of 12,019.4967 sq/m bounded on the North by lands of the Texaco Service Station, Blanco Auto Service, and J. J. Gerardino; on the South by "Corchado" Street, on the East by "Figueroa" Street, and on the West by "Labra" Street. It was stated in the Report that "Del Rosario" Street had been eliminated by Ordinance No. 95 of 1955–1956. It was also stated that the *west part* of the consolidated parcel *was being used for an active recreation park* and that the Board did not have any objection to the withdrawal from public use of the lands devoted to a recreation park and to devote same for private purposes provided that the steps taken for acts of this nature were complied with. Entry was made of this Report and of its amendment in the Registry of Property on August 25, 1958.

xi. By Certificate No. 465 of April 7, 1958, and pursuant to Arts. 31 to 36 of the Mortgage Regulations as

amended, the Government of the Capital obtained the recording in its favor of: (1) the parcel segregated according to deed No. 6 of January 16, 1928 executed before Martínez Dávila, with an area now of 3,775.2269 sq/m; (2) the parcel in litigation described all the time as "Recreation Square", with an area of 3,735.7278 sq/m now; and (3) the parcel part of "Del Rosario" Street in litigation, with an area of 1212.9462 sq/m.

xii. In the Certificate it was stated, for the Registrar, that the portion (1) had been acquired in the aforesaid manner, and that portions (2) and (3), Square and Street, had been acquired by a *grant* from the heirs of Carmen Reyes to the Municipality *through deed No. 4 of January 9, 1922 executed before notary Salicrup*. It was stated to the Registrar that the portion (2) (Square) was devoted for a long time to the public use as a "Recreation Square" and that by Ordinance No. 84, 1956–57, said recreation square was withdrawn from public use to private use; that portion (3) (Street) was devoted for a long time to public use, "Del Rosario" Street having been laid out and that by Ordinance No. 33, 1957–58, it was withdrawn from the public use to devote it to private use.

xiii. We have examined Ordinance No. 84, 1956–57, mentioned therein, and the property described therein to be withdrawn from public use, can hardly be reconciled with the parcel which from the first instance was described as "Recreation Square." It was finally stated in this Certificate that the Municipality of San Juan had been in the possession of the three described parcels for more than 30 years quietly, publicly, and peacefully, without interruption, and as owner *"from the date of their acquisition."* These parcels were recorded separately in favor of the Municipality on August 15, 1958, first entry, although portion (1) with 3,775.2269 sq/m

had been, according to the record, object of consolidation with another, creating a different body.

xiv. By deed No. 17 of June 4, 1958 executed before notary Margarita Landrau they proceeded to consolidate the three portions described in the foregoing paragraphs xi and xii and Certificate No. 465 of April 7, 1958, plus a fourth parcel with 3295.5558 sq/m (parcel "B" of the previous *Drawing*, with 3200.72 sq/m its area being corrected now) creating a different property which was recorded as property No. 4891 on August 25, 1958, 1st entry. This consolidated parcel had been described with an area of 12,019.4567 sq/m creating the polygon comprised between "Labra" Street on the West, "Corchado" Street on the South, and "Figueroa" Street on the East, and bounded on the North by Texaco, Blanco, and Gerardino. In this deed the origin of the title of the first three parcels as stated in Certificate No. 465 was ratified, and it was repeated that Ordinance No. 84 of 1956–57 had withdrawn the "Recreation Square" from public use. We repeat that the description of the property made in this Ordinance does not answer to the known description of the "Recreation Square." With respect to the fourth consolidated parcel, which according to the record had been acquired by the Municipality by deed No. 6 of December 16, 1928 consolidated with another, it is now stated that the Municipality obtained it by judgment in civil case No. 40,991 on Nullity, etc., between the Capital as plaintiff and Cipriano Manrique and others as defendants, and that it appeared recorded as property No. 2554. (This property had been consolidated with another in said deed No. 6.)

xv. By Joint Resolutions Nos. 118 of June 25, 1958 and 84 of June 6, 1960, and deeds No. 22 of September 5, 1958 and No. 7 of August 8, 1960, both executed respectively, before notary Margarita Landrau, the title of this parcel of

12,019.4567 sq/m was conveyed to the People of Puerto Rico and again to the Municipality of San Juan.

xvi. By Ordinance No. 46 of September 15, 1960 the City Manager of the Capital was authorized to sell this parcel of 12,019.4567 sq/m because it did not have any public use for the Municipality.

xvii. In the Planning Board's Report No. 61-C-114 of November 16, 1960, the sale proposed by the foregoing Ordinance was favorably recommended. It is stated in the Report that the offices located in part of these lots had been transferred; and that the "recreation area" had been substituted by others located in adjacent sectors; that these lands would be interchanged to the Federal Post Office Bureau for another lot although the Post Office had desisted from building its central office in that place. The project was approved considering that the land (12,019.4567 sq/m lot) did not have any use for the Municipality and that with the product of the sale other programs could be taken care of provided the sale was in harmony with the zones in force.

xviii. On the same date, November 16, 1960, the Planning Board rendered Report 61-P-1007, where reiterating that this property was no longer devoted to public use, it authorized its sale (12,019.4567) in three segregated parcels of 4,019.4967 (.4567) sq/m and two others of 4,000 sq/m each. It authorized the segregation involved therein, exempting the Municipality from the Regulations, in order that the Registrar would record the segregated parcels.

xix. By Act No. 9 of May 15, 1962, the Legislature Authorized the Municipality to sell the parcel of 12,019.4567 sq/m without being subject to auction for the minimum price of $800,000.

xx. According to the Planning Board's Report No. 62-P-1401 of March 14, 1962, the Municipality of San Juan was authorized to lease, for the purpose of parking lots, lands to

the East of "Labra" Street corner of "Corchado" Street described as a Parcel of 6,011.34 sq/m bounded on the North by "Labra" Street and J. J. Gerardino, Blanco Auto Service, and Texaco Gas Station; on the South by "Corchado" Street and lands of the Aqueduct and Sewer Authority and the Municipality of San Juan; on the East by the Municipality of San Juan and Gerardino, Blanco, and Texaco, and on the West by "Labra" Street and "Corchado" Street and Aqueduct and Sewer Authority. Presumably, this parcel of 6,011.34 sq/m is a part of the polygon of 12,019.4567 sq/m previously described and possibly, although we cannot accurately say so considering the former description, the "Recreation Square" or part thereof and the portion of "Del Rosario" Street in litigation are likewise included.

xxi. On January 22, 1964 the Board of Awards of the Municipality of San Juan adjudged the leasing of the parcel of 6,011.34 sq/m aforedescribed for a parking lot to Arcadio Morales for the rent of $635 monthly. The contract was accepted on January 29, 1964.

xxii. On February 1, 1946, and by virtue of the letter sent to the Registrar by the then attorney for the Municipality of San Juan, Mr. Fernando B. Fornaris, the Registrar entered notice at the margin of the recording of the property "El Reloj" stating the portions separated for streets in the partition of this property. Different from other expressions as to "Del Rosario" Street, in this document the Municipality states through its attorney that these streets were "open and placed at public service or domain, have been and still are for the enjoyment of the common good." In a Certificate dated November 29, 1963 the Registrar certified that with respect to the areas reserved for streets no segregation had been performed, and that the property "El Reloj"—except the segregations made entered as separate properties—appears recorded in favor of Ángela, Juan, José Víctor, Ángel, and

Casimiro Figueroa Reyes and Luis de la Cruz and Enrique Adsuar Boneta.

xxiii. Ángela Figueroa Widow of Torres Monje, by herself and in representation of others in her class, filed a complaint against the Government of the Capital, dated June 25, 1945, Civil No. R-5777 of the former District Court of San Juan about "Compensation and Damages." She alleged that the following persons were in the same position as plaintiff: José Víctor Figueroa, Rita de la Cruz Santiago, Casimiro Figueroa, Heirs of Enrique Adsuar, Ángel Figueroa Reyes, and Juan Figueroa Reyes.

xxiv. It was alleged in this complaint that at no time did the plaintiff or the other co-owners grant, convey, or donate gratuitously to the Municipality of San Juan the lands selected for the streets within the property "El Reloj", but that without their opposition and by recognizing their rights over said lands as well as that of being compensated for the just and equitable value of the same, the Municipality proceeded to pave and to devote to public use *"some"* of the indicated streets; that "Del Rosario" Street had been *completely* suppressed incorporating part of it to a lot belonging to the Municipality and part to the delimited parcel for a recreation square; that those lands had a value of $250,297.90 without the Municipality having compensated her nor any of the other co-owners; that she had not received compensation from the Municipality for 2000 sq/m occupied by part of "Del Rosario" Street incorporated by the Municipality to another property belonging to the latter this portion having a value of $30,000; that the Municipality withheld and occupied the separate lot for a recreation square without any title as well as another portion of "Del Rosario" Street, which is part of this lot, both having 4,000 sq/m; that the Municipality had granted this property to a private entity, for the establishment of an athletic park or for other purposes, depriving plaintiff of this

property, with a value of $80,000. In the prayer the court was requested to render judgment ordering the Municipality of San Juan to satisfy the aforementioned sums.

xxv. The Municipality denied the essential facts and among other things it alleged in its amended answer that former administrations had built a removable frame building on part of "Del Rosario" Street without having the intent of taking possession of a part of said street since it belonged to the community in general when it was devoted to public use; that the Municipality had not incorporated part of said street to a property of its own, the truth being that Luis de la Cruz Santiago had sold to the Municipality by deed of January 16, 1928 executed before Martínez Dávila a parcel composed of 8530 sq/m made up by two others and which were consolidated as one property including "*fraudulently*" the area which "Del Rosario" Street occupied between "Figueroa" and "Labra" Streets, with an area of 1259.85 sq/m; that the Insular Park Service of Puerto Rico proceeded to build a recreation park in the parcel intended for "Recreation Square" according to deed No. 4 of 1922, and that said park was a completely public place for the purposes to which it was to be devoted. In this complaint it was sought to collect from the Municipality of San Juan the pecuniary value of all the areas separated for streets in the deed of 1922 of division of the property "El Reloj" as well as the area intended for "Recreation Square." Subsequently the prayer was amended so that in default thereof the return and delivery to plaintiffs of said areas be ordered.

xxvi. Civil Case R-5777 was decided by judgment of November 10, 1948. In his findings of fact Judge Cordovés Arana, determined, among other findings grounded on the evidence and on an ocular inspection that:

1. That "Del Rosario" Street was in part open to the public although on a portion of the same the Municipal-

ity had built a frame building and columns used as a garage since 1940 which interrupted the traffic along said street. That also there existed other buildings of the Municipality on the same street.

2. That the executing parties of deed No. 4 of January 9, 1922 had the same legal standing as the plaintiff therein.

3. That the parcel devoted to "Recreation Square" was (when the judgment was rendered) open to the public as an *athletic park* administered by the Insular Government Park Commission. The land of the park was swampy and marshy and in order to use it as an athletic park it was filled, leveled, and conditioned, it being at the time a public place where there were tennis and basketball courts, a diamond to play baseball and other recreation equipment for children. That these works were financed by the War Emergency Program (W.E.P.) and sponsored by the Insular Park Service.

4. That the two parcels consolidated by Luis de la Cruz by deed No. 6 of 1928 executed before Martínez Dávila and deed No. 12 executed before Martínez Rivera were not adjacent between themselves, "Del Rosario" Street being in the middle.

5. That a part of "Del Rosario" Street of 705.93 sq/m to the East of "Labra" Street had been incorporated to the park area and was used as such but that it could be separated and turned into a street again. "Del Rosario" Street was paved in part and only backfilled in part.

6. That in relation to the assessment of the property "El Reloj", the 50,018 sq/m devoted to streets and the 4,500 devoted to "Recreation Square" did not pay taxes since the year 1922–23.

xxvii. These were the conclusions of law made by Judge Cordovés Arana:

1. That from the fact that plaintiff in that case had waived her first cause of action (where $250,297.90 was claimed as the pecuniary value of the areas separated for streets) he could infer that she and the others had accepted that such lands for streets and a recreation square were "granted, conveyed, and gratuitously donated to the extinct Municipality of San Juan," and "devoted" by the latter, "to the public use for which they were granted, *except a part of 'Del Rosario' Street and the parcel devoted to a square.*"

2. That if this inference were not logical he could reach the same conclusion since it appears from the evidence that said lands had been tax exempt since the year 1922–23 because the same belonged to the Municipality and the latter had devoted them to public use, and also because the owners of the lots adjacent to said streets had conveyed many of them to third persons, these third persons acquiring the right to the use of those streets jointly with the public in general.

3. Judge Cordovés concluded that "Del Rosario" Street, in the part comprised between "Figueroa" and "Labra" Streets had completely disappeared and that its surface of 1259.85 sq/m was *"devoted by the Government of the Capital to uses other than those for which it was donated."* The Municipality had buildings on 553.92 sq/m of that area and the remaining 705.93 had been integrated to the *Athletic Park* administered by the Insular Government Park Commission.

4. That the parcel donated for the "Recreation Square" had been consolidated with a lot of the Municipality together with the 705.93 sq/m of "Del Rosario" Street and that in this area the *Athletic Park* was built, financed with funds of the War Emergency Program.

5. Judge Cordovés Arana concluded that the Government of the Capital departed or deviated from the ends for which "the dedication and consecration was made" as to

said part of "Del Rosario" Street and the parcel for the public square, although as to the latter, the purpose for which it was being devoted was not "inconsistent" with the purpose for which it "was donated." The magistrate determined that there was a difference between a "Recreation Square" and an "Athletic Park." He likewise determined that in said area the Municipality could build the "Recreation Square" in the parcel "donated" for this end and at the same time keep the *Park* in the lots which belonged to it.

6. Finally he concluded that these actions of the Municipality did not reveal an abandonment of the "dedication" and that neither did they constitute a cause for the lands to revert to their former owners *"since their use continues being public."* That as to the part of "Del Rosario" Street devoted by the Municipality to purposes different from the ones for which said street was "donated", the Municipality "could be compelled to comply specifically with the dedication by removing the structures which exist thereon, which according with the evidence can be easily removed, and rebuilding said part of the street *to open it to the public."*

xxviii. Deciding, on the foregoing grounds, that plaintiff therein and persons in a similar position did not have a legal ground to recover the lands involved in that action nor their pecuniary value, and that the remedy could be an action to compel the Municipality of the Capital to "comply specifically with the conditions of the dedication" the complaint, Civil Case No. R-5777, was dismissed.

(19) The trial court concluded upon disposing of the case in the instant proceeding:

i. That there was identity of parties between the plaintiffs herein and the plaintiffs in case R-5777, the plaintiffs herein being successors in interest of the former, except Ángela Figueroa who still lives.

ii. That there existed identity of things with the previous action.

iii. That it having been established in case R-5777 as in this one, that the lands in controversy passed from plaintiffs' private ownership to public domain, it had been judicially adjudicated already that plaintiffs are not the owners of the property in litigation.

iv. And "that the judgment rendered in the previous case, R-5777, being final and unappealable there existing the most perfect identity between the litigants and their successors in interest and the things and causes object of the lawsuit since the said judgment decides definitively *the matter of the title*, the conclusion that it is proper to sustain the defense of res judicata is inescapable. *Muñoz* v. *Pardo*, 68 P.R.R. 569–572 (1948); *Silva* v. *John Doe*, 75 P.R.R. 198, 203 (1953); *Araújo* v. *Arenas*, 60 P.R.R. 277, 289–290 (1942)."

"But even assuming that the defense of res judicata would not prosper, *the question of the Municipality's title* over the lands in controversy could not be discussed, nor *relitigated* in this action since the specific fact of the title in favor of the Municipality is an ultimate fact previously adjudicated between the parties in the so many times mentioned case R-5777, which cannot be object of new litigation under the theory of collateral estoppel by judgment. *Fuentes* v. *District Court*, 73 P.R.R. 893, 911 (1952); *Pereira* v. *Hernández*, 83 P.R.R. 156 (1961)."

v. Considering that the action was res judicata as to the ultimate fact of the Municipality's title, or that there was an *estoppel* to challenge it as it had been already adjudicated by final judgment, the Part stated that it deemed it unnecessary to rule about other questions of law and proceeded to dismiss the complaint. Among those other reserved questions of law it mentioned "*the reversion* of the possession to the

donor or to his successors in interest *if the public use is abandoned* at any moment and for any reason."

—III—

*Consideration of the Litigious Question*

A.—*Res Judicata.*

Among the presumptions which the Civil Code—§ 1204, 1930 ed.—establishes, it is stated that "Only a judgment obtained in a suit for revision shall be effective against the presumption of *the truth of the res adjudicata*"; that in order that the presumption may be valid in another suit, "it is necessary that, between the case decided by the sentence and that in which the same is invoked, there be the most perfect identity between the things, *causes*, and persons of the litigants, and their capacity as such." (Italics ours.) Further on: ". . . there is identity of persons whenever the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they are jointly bound with them or by the relations established by the indivisibility of prestations among those having a right to demand them, or the obligation to satisfy the same."

The presumption of res judicata has well defined exceptions at law and of equitable order. *Pérez* v. *Bauzá*, 83 P.R.R. 213, 217–218 (1961) ; *Millán* v. *Caribe Motors Corp.*, 83 P.R.R. 474, 485–489 (1961) ; *Suárez Fuentes* v. *Superior Court*, 88 P.R.R. 133, 148 (1963) ; *Viera* v. *Racing Comm'n*, 81 P.R.R. 688, 699 (1960) ; *Tartak* v. *District Court and Cruz, Int.*, 74 P.R.R. 805, 812 (1953) ; *Vidal* v. *Monagas*, 66 P.R.R. 588, 606 *et seq.* (1946), and see opinion affirming in 179 F.2d 99, 106; *cert. denied*, 335 U.S. 911; *Riera* v. *Pizá*, 85 P.R.R. 256, 262, *et seq.* (1962) ; *Rodríguez* v. *Heirs of Pirazzi*, 89 P.R.R. 494, 507–509 (1963) ; *Feliciano Ruiz* v. *Alfonso Develop. Corp.*, 96 P.R.R. 105, 110 (1968).

The problem which indicates the representative manner in which both actions, that of suit R-5777 and this one, have been filed appears initially in the consideration of this aspect of the appeal.

Complaint R-5777 is not one filed affirmatively by all the executors of deed No. 4 of 1922 as coparties in a complaint.— (Rules 19 and 20 of the Rules of Civil Procedure of 1943.) Ángela Figueroa appeared alone therein and apparently assumed a representation alleging that the other persons mentioned were in the same legal and factual position as her. The Municipality denied this allegation as a question *of fact.* Apparently that was an action under Rule 23 of 1943 which allowed class action. Under this Rule, the person could assume the representation of others when the nature of the right sought to be enforced for or against the class was:

"(1) Joint or common, or secondary in the sense that the owner of *a primary right* refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

"(2) *Several,* and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) *Several,* and there is a common question of law or fact affecting *the several rights* and a common relief is sought." (Rule 23, 1943.) This rule gave effect here to Rule 23 of the Rules of Federal Procedure.

The instant action was brought under Rule 20.1 of the Rules of Civil Procedure of 1958. In essence and substance it is like the 1943 one, except some changes in the exposition.[3]

---

[3] Like the Rule of 1943, the Federal Rule 23 of 1937 provides in its subsections (2) and (3):

"(2) *Several,* and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) *Several,* and there is a common question of law or fact affecting the *several rights,* and a common relief is sought."

In the 1958 Rules the term *"several"* appears incorrectly translated [into Spanish] as *"solidario".*

In *Caguas L. Y., Inc.* v. *Superior Court*, 96 P.R.R. 826, decided on January 28, 1969, we followed the judicial gloss of other jurisdictions which classifies class action under paragraph (1) as a true class action; that under paragraph (2) as an action called hybrid, and that under paragraph (3) as a spurious class action.[4]

We reach the conclusion that it is not necessary now to delve into a detailed consideration and discussion as to the classification of the actions brought herein, and its effect as to res judicata. The record convinces us, irrespective of the foregoing factors that it was not proper for the trial court to sustain the defense of res judicata, even as to Ángela Figueroa herself, only direct party appearing in both litigations.

Deed No. 4 of January 9, 1922, ground for the action, states verbatim: "That the co-owners of the property El Reloj have held different interviews and meetings to talk about this division and finally they met in San Juan, in the offices of Banco Comercial de Puerto Rico, on October 9, 1921, and agreed to perform the material division of a part of the aforedescribed property El Reloj, *determining to that effect, for the improvement of the property in benefit of all*, the different *streets and recreation square* previously agreed upon; which are the following:" (they are described). (Italics ours.)

The foregoing is the complete statement in the record which would serve as ground for the view of a "grant" of the property on the part of its owners, or of an "application" or "destiny" of the areas of streets and square "in benefit of all." Judge Cordovés decided and it was clearly adjudicated in

---

[4] For the effect that each one of these classifications has insofar as the presumption of res judicata is concerned, see the known study, still in actuality, of James Wm. Moore and Marcus Cohn, *"Federal Class Actions— Jurisdiction and Effect of Judgment"*, 32 Ill. L. Rev. 555; *"Binding Effect of Class Actions* (Note), 67 Harv. L. Rev. 1059; 3 Moore's Federal Practice 3434 *et seq.*, 3456 *et seq.*, 2d ed. 1968; *cf. Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U.S. 356; *cf. O'Hara* v. *Pittston Co.*, 42 S.E.2d 269 (Va.).

his judgment, with respect to the recreation square and the part of "Del Rosario" Street now in litigation, that the Municipality was not giving them the public use for which they had been "granted."

The street, because the Municipality had erected a building on a part of it which interrupted the traffic, and the other portion had been integrated to the square; and the square, because it was not being used as a "recreation square" which was the use for which it had been "granted" by the owners, but that together with the portion of "Del Rosario" Street which was added to it, it was being publicly used as an *athletic park*, the judge being of the opinion that the use of the "recreation square" and the "athletic park" were not the same public use.

Judge Cordovés considering that the building erected on part of "Del Rosario" Street was easily removable, and that the part integrated to the square was restorable as a street; and considering that the public use to which the "recreation square" was being devoted as an athletic park was not "incompatible" with the one for which it had been intended by the owners, and that it was easy to maintain both public uses, the athletic park on lands belonging to the Municipality, and the square on the lands intended therefor, Judge Cordovés decided and ruled before this state *of facts*, that it was not proper to sustain such complaint and compensate plaintiff therein and the others the value of such lands. In support of the decision, Judge Cordovés stated that the owners had a cause of action to compel the Municipality to reinstate the public use intended for them.

There is nothing in Judge Cordovés' ruling in action No. R-5777 which would adjudicate *private title* in favor of the Municipality over these properties, which is the substantial fact litigated in the instant case. That fact, essential to the actual lawsuit, could not have been therein judged, since

the events of the permanent withdrawal of those properties from public use, and consequently, the *conversion* by the Municipality of the same to its *private* property occurred after the judgment in the previous lawsuit had been rendered.[5]

In *Chabrán* v. *Méndez*, 74 P.R.R. 719 (1953), we had already stated about the foregoing citing from Restatement, Judgments 211, § 54 (74 P.R.R. 731):

" 'When a judgment is rendered for the defendant on the ground of the non-existence of some fact essential to the plaintiff's cause of action, the plaintiff is not precluded from maintaining an action *after such fact has* subsequently *come into existence*. . . . In such a case if the plaintiff brings an action before the event has occurred, and judgment is given for the defendant on this ground, the plaintiff is not precluded from maintaining an action after the event has occurred.' " (Italics ours.)

In *Fels* v. *Biascoechea*, 77 P.R.R. 644 (1954), citing from 2 Freeman, Judgments 1501–4, 5th ed., we reaffirmed what was said in *Chabrán, supra* (77 P.R.R. 648):

" '. . . And the same is true with respect to a decision that no right or cause of action exists; it does not bar a second action *when new facts have created a right or cause of action.'*

---

[5] Only once, in the opening statement, did Judge Córdovés refer to the lands conveyed or granted to the Municipality of San Juan and devoted by the latter to public use. That expression cannot be construed as one which adjudicated a *private* right as such construction would be incompatible with the very ruling of Judge Córdovés in determining that the properties were devoted in part to a public use and it was easy to reinstate them to the use intended by the owners, and in recognizing in the latter a cause of action against the Municipality, under the circumstances of those facts, in order to compel it to maintain the properties in the use for which they were intended. That expression is rather the result of the tendency in many judicial expressions of not making the required distinction between a property for public use and property *privately* owned by the State or public bodies, and the tendency to confuse them. Recently this Court had occasion to make the due explanations in *Rubert Armstrong* v. *Commonwealth*, 97 P.R.R. 573, decided on June 27, 1969. And see, for likewise explanatory purposes, the expression of Mr. Justice Hernández Matos of June 27, 1969 in *Commonwealth* v. *Superior Court*, 97 P.R.R. 629. (On reconsideration) in which Mr. Chief Justice and this Justice concurred.

". . . Since, in the complaint now before us, it is specifically alleged that 'after the business between plaintiff and defendant was liquidated . . . there was a balance for plaintiff and against defendant . . . ,' and, pursuant to the authorities cited above, the judgments rendered by the courts of the neighbor country are not res judicata." (Italics ours.)

■ In the case at bar, the essential fact which gave rise to this cause of action appeared, as a cause of action for a judicial remedy, subsequent to the ruling in action No. R-5777, that is, it appeared when the public use and domain of the square and of the part of the street in litigation was definitively ended in 1957, by government action, and the Municipality gave itself title of *private and separate* ownership over said properties according to the aforementioned Certificate No. 465 of April 7, 1958 and Ordinances Nos. 84 of 1956–57 and 85 of June 5, 1957.

On the grounds stated, it did not lie to maintain in this lawsuit the defense of res judicata.

### B.—The Title.

Before the set of facts which appears from the record, the litigious question revolves around the plaintiffs' property right over these properties against the property right of a *private* and separate nature which the Municipality alleges to have over the same.

As the circumstances concerning the part of the street and the square are not identical, we shall discuss each case separately.

1. *The Square.*

Different from the situation *of fact* commonly presented in cases decided where there exists the formal conveyance of ownership title of some properties to a government entity with the imposed condition that they are to be devoted to public use and domain, it is an undeniable fact that in this

one, plaintiff, Ángela Figueroa Reyes, and the predecessors of the other coplaintiffs did not grant or convey any title of *private* ownership in favor of the Municipality of the 4,500 sq/m which they separated for a recreation square by deed No. 4 of January 9, 1922. All that is expressed in said deed is what we have already mentioned: that the co-owners having met, (we cite):

". . . agreed to perform the material division of a part of the aforedescribed property El Reloj *determining to that effect, for the improvement of the property in benefit of all,* the different streets and recreation square previously agreed upon; which are the following:" (they are described). (Italics ours.)

It is an undeniable fact that the recreation square was actually and effectively intended for public use and domain, and it was thus adjudicated by Judge Cordovés Arana in his judgment of 1948. It continued devoted to such public use and domain until the Municipality, with the consent of the Planning Board, ended that use and domain in 1957, and by Certificate No. 465 of April 7, 1958 recorded said square in the Registry as its *private* and separate property.

It is another undeniable fact that since that conversion in 1957, the Municipality has been in possession of the square and has performed acts of full ownership over it, as the fact of consolidating it with other parcels privately owned by it and thus consolidated seeking to sell it or exchange it, and later lease it to a third-party for a parking lot. In the light of these events any *private* or separate title of the Municipality would have to suggest, by way of an acquisitive prescription, in the absence of a title by deed of grant and conveyance of the *ownership* on the part of the owners, and in the absence of special legislation about the matter which would provide, under those circumstances, the consolidation of a *private* title in favor of the Municipality. We shall refer a little further on to the aspect of prescription.

—O—O—

The problem which we are facing herein about the destiny of properties which have been devoted to public use and domain when such use and domain has ended, has deep historical roots in both occidental systems of jurisprudence, Latin and Saxon.

The property of public use and domain which is never susceptible of the commerce by men, and which lacks the condition of being alienable and prescriptive, is not subject to these considerations, different from the property which, being of an alienable nature and in the commerce of men, is devoted or applied to public use and domain, such use ceasing afterwards. This second type of property is the one involved in this litigation. *Cf. Rubert Armstrong* v. *Commonwealth,* 97 P.R.R. 573 (1969).

In several American state jurisdictions there exists positive legislation which regulates a priori everything concerning the dedication and application of private properties to the public use and domain, including questions of title. This positive legislation has sometimes modified historical rules of the English Common Law, and in such case, the destination and application by an owner of his property to public use and domain is governed, in its substantive aspects as well as in those of form, by those expressions of positive law and their action generates those juridical consequences which the law provides.[5a]

■ Under the classical rules of the English Common Law, in the absence of positive legislation to modify them and in the absence of a voluntary expression of the owner granting or conveying his title or imposing restrictions to the same, the American state courts are in agreement, following the Common Law, that once the public use and domain over

---

[5a] Fred Zengel—Elements of the Law of Ownership, commenting on Title II of the Louisiana Civil Code. 3 West's L.S.A. Civil Code 1 *et seq.,* 17.

alienable properties which were applied to such use, has ended, the same revert to the use and enjoyment by the owner who destined and applied them in that manner. In such case, there is no release of title and the Latin doctrine as well as the English Common Law agree in the view that in such situation the intervention of the State, the Municipality or of any other public entity is one of a *regulatory* order in the capacity of an *administrator* and not in a proprietary capacity.[6]

---

[6] "We have already indicated that, in our opinion the right of the moral person, *State, department, municipality,* over the properties of its public domain is not a proprietary right because it does not comprise the essential attributes of property, *usus, fructus, abusus.* The public domain belongs, *as long as its appropriation lasts,* rather to the public use than to the moral person on which it depends. The moral person has, over this part of his domain, nothing more than a right of *protection,* of *action,* of *administration,* [italics in the original] and not, as it has been said—incorrectly in our opinion—a proprietary right."—II-2 Colin and Capitant, *Curso Elemental de Derecho Civil* 71 *et seq.,* 80, 3d ed. 1952.

Citing abundant case law it is said in *Town of Chouteau* v. *Blankenship,* 152 P.2d 379, 383 (Oklahoma 1944):

"The general rule is that in the absence of a statute to the contrary the title to streets and alleys is held by the municipality *in trust . . . not in a proprietary capacity,* and the municipality is without power to alienate the same.

"By the great weight of authority a municipality cannot be divested of title to its streets *held in trust* for public use by adverse possession for the prescriptive period. [citations] We think this is the sound rule and adhere to it." (Italics ours.)

In the related case of *City of Fort Worth* v. *Burnett,* 114 S.W.2d 220 (Texas 1938), the same had already been stated at p. 223:

"It is established by the authorities that, where property is appropriated to public use by common law dedication of the owner, the municipality within whose borders the premises are situated *takes it,* as *trustee for the public,* for the special uses designated by the dedicator."

In this case a parcel was destined by its owner, for a square or park which would provide free space to breathe, and the Supreme Court of Texas decided that Fort Worth could not use part of the land to build a public library.

Reaffirming the principle it is repeated in *Hyland* v. *City of Eugene,* 173 P.2d 464, 466 (Oregon 1946):

"It is the universally accepted rule of law that land dedicated by a private owner for a specific purpose must be used in conformity with the terms of the dedication and not diverted to any other purpose. [citations],

Insofar as Book II—Ownership—of the Civil Code is concerned, in its Civil Code of 1808 as well as in the revision of the latter which was made in 1825, Louisiana departed in basic aspects from the Code of Napoleon of 1804, the latter with its provisions about said Book being more in harmony and similar to the ones which later form a part of the articles of the Spanish Civil Code. Louisiana preferred to adopt the principles on property of the Common Law codifying those principles in positive legislation. Thus:—its present Art. 482 (Art. 474 Civil Code, 1825), which departs from the Napoleonic and the Spanish Codes, and reads:

"Among those [things] which are not susceptible of ownership, there are some which can never become the object of it; as things in common, of which all men have the enjoyment and use.

"There are things, on the contrary, which, though naturally susceptible of ownership, may *lose* this quality in consequence of their *being applied* to some public purpose, incompatible with private ownership; but which *resume this quality* as soon as they cease to be applied to that purpose; such as the highroads, streets and public places." LSA C.C. Art. 482.

According to the foregoing Art. 482, those properties which are in the commerce of men with an alienable condition which have been applied or devoted to the public purpose and domain stop being a private property on account of *incompatibility* of use, but if the public purpose ceases, they resume the primitive condition of private property of the owner; whether the owner is an individual, or whether it is the

---

. . . When such a grant has been made by a private owner, the *municipality,* by accepting the dedication, *becomes a trustee* to carry out the terms of the grant *and it has no power to sell or lease the property* for purposes foreign to the dedication. [citation]

"In determining whether there has been a misuser or diversion of the property, courts *are more strict* in cases of grant by private owners."

This last view as to the most strict construction against the misuser when the dedication to public use has been made by a private owner, than when the property has been devoted to public use by the government entities themselves, is likewise of general acceptance by the courts.

State itself, Municipality, or public entity in its proprietary capacity.[7]

In Puerto Rico an identical civil policy governs. Insofar as the Second Book—Ownership—is concerned the Commission to compile and revise laws of 1901 which was created by the Foraker Act preferred to adopt many of the articles of the Louisiana Civil Code of 1825, in addition to the provisions of the Spanish Civil Code which governed here since January 1, 1890.

This was a conscious and desired preference, inasmuch as of the three Commissioners, Juan Hernández López, the notable Puerto Rican authority on civil law, was entrusted with the work of preparing the Civil Code which was later approved by the Legislature by Act of March 1, 1902, and governs here since July 1, of that year.[8]

---

[7] In its Art. 658 about servitudes, Louisiana states that that part of an estate upon which a servitude is exercised does not cease to belong to the owner, and therefore, the *soil or land* of a *public road* belongs to the proprietor or owner, although the public has the use of them. Of course, the foregoing will not apply if the State or a public entity has condemned an ownership title of the land or if it has acquired said title consensually, or if there exists a statute which governs the matter in a different manner and requires compliance with certain formalities. *Cf. Lamartiniere* v. *Daigrepont,* 168 So.2d 373, 376 (La.).

[8] Report from the Commission to Revise and Compile the Laws of Puerto Rico. Washington, Government Press, 1901. Luis Muñoz Morales states:

"Notwithstanding that statement and although the revision of the Civil Code was entrusted to the Puerto Rican Commissioner, *the influence of the North American view* was greatly noticed in this Code because not only the modifications which the change in regime naturally required were made, *but articles from the Code of Louisiana were interpolated,* and other doctrines radically opposed to our historical Civil Law were introduced, and the explanation given in the report of our Puerto Rican Commissioner, after maintaining a view of gradual adaptation, but not of equality, to the institutions of the States and territories of the Union, reads verbatim:

'Such principles and such view have served as grounds for the revision of the Civil Code, and if it is somewhat defective it is rather on account of having fallen on the side of the reform in many cases, not so much because of the conviction that some of the present reformed institutions are not good, but because of the desire of prac-

Thus, the above-copied and commented Art. 482 of Louisiana was literally brought to our civil system as § 349 of the Civil Code of 1902 which continued in effect as § 274 of the 1930 edition.

In a decision of 1865, Louisiana construes and applies Art. 474 of 1825, equal to its present Art. 482, in the sense that when the public purpose of a strip of land dedicated by its owner to a road ceases, the title belonged to the owner and not to the proprietors fronting said road. It was decided that the fact that the owner sold lots adjacent to the road did not constitute a sufficient fact for the relinquishment of his title to divest him of the same pursuant to Art. 474 (482). *Méndez* v. *Dugart*, 29 La. Reports 116, 117. Article 482 had been construed in that manner when we adopted it in 1902.

The foregoing principle is reaffirmed in another known case—*Louisiana Highway Commission* v. *Raxsdale*, 12 So.2d 631, 634 *et seq.* (La. 1943). Here a predecessor of the defendants sold to the Municipality of Alexandria in 1868 by a public deed which was recorded, a strip of land part of a greater tract, it having been stated that it was for a street. The price, $50. In fact the strip was never used as a street and the public use was considered as abandoned. Applying and following Art. 482 in the sense that this was a property susceptible of reverting to private ownership after the public use had ceased, or in the absence of such use, the court held that although the defendants' predecessor had conveyed title in favor of the Municipality by a recorded deed, he and the defendants, his successors, had been in possession of the land

---

tically showing the fervent adherence to the principle of identity *in everything that might seem just* or at least *rational.*'" (Italics ours.) *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico.* First Book, p. 23 *et seq.*

The Legislature appointed its own joint committee of the House and the Executive Council to study the Code submitted by the Commission, and accepted likewise the adoptions made from Louisiana.

as owners for over 30 years and the latter were entitled to acquire a title by prescription against the Municipality.

In *Ferrente* v. *Tantilla* the doctrine is ratified and it is stated, 42 So. 2d 379, 381 (La. 1949):

"There is no doubt under the jurisprudence of this state that when a public road is abandoned, the abandoned portion reverts to private ownership of the person owning land over which it passes. See *Goree* v. *Midstates Oil Corporation*, 205 La. 988, 18 So.2d 591, and *Article 482* of the Louisiana Civil Code."

In this case it was decided, however, that as a question of fact the public purpose had not ceased or had not been abandoned.

In the subsequent decision of *Green* v. *Chamberlain*, 60 So.2d 120 (La. 1952), in an ample discussion at p. 125 *et seq.*, it is said, after citing Art. 482 verbatim: "It will be noted that the article does not make public places per se insusceptible of private ownership but only when applied to a public purpose *incompatible with private ownership*." (Italics in the original.)

In a case quite similar to the instant one, as to its facts, a proprietor in 1812 marked in a drawing of his property a "parcel" destined to a public square. In effect, the parcel was used in this manner by the public until 1886. In 1882 the Municipality, by an ordinance, conveyed or tried to convey the square to the Board of Education, and in 1886 the latter built on the same a school, the public use as a square ceasing. The Board filed an action against the heirs of the owner so that its title would prevail over that of the latter.

The Supreme Court of Kentucky—*City of Bowling Green* v. *Board of Education et al.*, 278 S.W.2d 726—in view of those facts decided that when the Municipality conveyed the lot to the Board the public use of the square ceased, and at that time the title of the lot thus destined reverted to the

original owner. With abundant citations from case law the court stated: (p. 727)

"Where property dedicated to the public is abandoned or relinquished, the public's rights are terminated and the land by operation of law reverts to the dedicator." (citations)

Deciding then the question of the title between the Board and the heirs of the owner, the court held that the title had reverted to the latter in 1886 when the public use ceased and the Board built the school, but the Board, having been in public and exclusive possession of the lot since that date and for sufficient time, its possession adverse to that of the heirs ripened into full title by adverse possession. The same basic ruling has been followed by California when the public use of streets has ceased. *Cf. Loma Vista Investment* v. *Roman Catholic Archbishop*, 322 P.2d 35, 38 (1958).

We do not doubt the power which the Municipality of San Juan had to withdraw the square and the street from public use, following, as it followed, the legal proceedings to such effect. The closing of a street or eliminating a public square may be a necessary governmental function for the general benefit, under the police power of the State. With the passing of time and with urban developments, the government cannot remain tied forever by the use given to a property which was fixed at a remote time by its owner.[9]

Section 274 of the Civil Code, 1930 ed., identical to Art. 482 of Louisiana, provides:

---

[9] See: in the general picture for illustration, *Central Land Co.* v. *City of Grand Rapids*, 4 N.W.2d 485 (Mich. 1942), and monography in 144 A.L.R. 487; the aforecited cases of *Hyland* v. *City of Eugene* (Oregon); *Town of Chouteau* v. *Blankenship* (Oklahoma); *City of Fort Worth* v. *Burnett* (Texas); *Lamartiniere* v. *Daigrepont* (La.); 12 Tulane Law Review, Comments 428, 429; 13 Tulane Law Review, Comments, *"The Effect of Dedication to Public Use in Louisiana"* 606 *et seq*. In the Louisiana case law it should be taken into consideration that some decisions rely on special legislation separate or complementary to the Code to govern certain situations.

"Among the things which are not susceptible of ownership are comprised those which cannot become private property by reason of the object for which they are intended, such as things in common, or those the use and enjoyment of which belong to all men.

"There are other things, on the contrary, which, although by their nature are susceptible of private ownership, lose this quality as a consequence of their being applied for public purposes inconsistent with private ownership, but which may acquire their former condition so soon as they cease to be applied to that purpose; such are the lands used for highroads, streets and public squares."

No title deed having been executed by the appearing parties in deed of partition No. 4 of January 9, 1922 alienating the ownership in favor of the Municipality of San Juan; in the absence of special legislation on the matter disposing of the title in such cases, as it occurs in several states;* and pursuant to § 274 as it has been correctly construed and applied in the jurisdictions of its origins, we must decide that when the public use and domain of the square definitively ceased in 1957 by action of the Municipality through the legal proceeding provided therefor, said square acquired *its original condition* of private property of its owners.

■ The properties devoted to public use and domain and thus used by the community in general do not produce prescription for or against anybody. The Saxon and Latin doctrines are also in agreement as to this point. See § 1836, Civil Code, 1930 ed., Colin and Capitant, *op. cit.* at 73; *Louisiana Highway Commission* v. *Raxsdale, supra* at 635; *Locke* v. *Lester,* 78 So.2d 14, 16 (La. 1955).

■ The record establishes, however, that when the public use and domain of the square ceased in 1957, the Municipality remained in possession and performed acts of ownership over

---

* See, for example, provisions such as §§ 837, 8324, 8330, 8331, in the California Legislation, which follow the doctrine of the Common Law. [sic] West's, Ann. Str. & H. Code, mentioned sections.

the same, as we have stated. As of that moment the acquisitive prescription began to run in favor of the Municipality by reason of its possession adverse to that of plaintiffs. The instant judicial action having been brought on December 11, 1962, the Municipality did not possess for the minimum term required under any type of prescription to obtain ownership title by adverse possession.

For all the foregoing grounds the judgment which dismissed the complaint shall be reversed insofar as the square is concerned. Another one will be rendered decreeing that as of 1957 when the public use and domain ceased, the plaintiffs, as grantors and successors of the grantors of deed No. 4 of January 9, 1922, have the ownership title over said square; ordering the nullity of Certificate No. 465 of April 7, 1958 and the operations which gave rise to that certificate, and ordering the nullity of the recording of this property in the Registry in favor of the Municipality of San Juan as its private and separate property.

2. *Del Rosario Street.*

The record contains contradictory statements of the Municipality officially made at different times as to whether or not Del Rosario Street was of public use and domain. In his judgment of 1948 Judge Cordovés Arana concluded that the street had been publicly used, although the Municipality had obstructed the road with a removable building.

Besides that, there exists the fact that in deed No. 6 of segregation, consolidation and sale executed before Notary Martínez Dávila in San Juan, Puerto Rico, on January 16, 1928, transaction which is repeated by deed No. 12 of August 15, 1929 before Notary Edelmiro Martínez Rivera, the consolidation and segregation made therein of the parcels adjudicated in 1922 to Rita de la Cruz Santiago (see Drawing, p. 527), Del Rosario Street was improperly included between Labra and Figueroa Streets. In this manner the

Municipality acquired the consolidated and segregated property for the price of $51,180.

In the light of the evidence in the record, Rita de la Cruz was not adjudicated a title over the portion of this street, nor to any other co-owner, and it was unlawful to include it in the consolidation and segregation and sale to the Municipality. The Municipality itself in answering the complaint in action No. R-5777 alleged affirmatively: ". . . it being true that one of the persons who signed deed number four of January 9, 1922 'About Division of Lands', executed by plaintiffs, that is, Luis de la Cruz Santiago, married to Rosa Figueroa Reyes, and who appeared in said deed as proxy for Rita de la Cruz Santiago, by deed number six executed before Notary José Martínez Dávila, on January 16, 1928, sold to the extinct Municipality of San Juan, now Government of the Capital, for the sum of $51,180 a parcel located in the South Part of the Ward Santurce in the municipality of San Juan; composed of 8,530 square meters, parcel which was formed by two segregated parcels and *unlawfully* consolidated to make one only. Defendant continues alleging to the contrary that in the sale to which reference is made, the Municipality of San Juan, now Government of the Capital *unlawfully appropriated the area which Del Rosario Street covers* in a part comprised between Figueroa and Labra Streets, with a total area of 1,259.85 square meters." (Italics ours.) Judge Cordovés Arana, in his findings of fact, determined that those properties could not be consolidated since the street was in the middle.

The Municipality made the foregoing statements in the year 1947. The record does not allow us to determine, whether or not on January 16, 1928 and on August 15, 1929 when it acquired by public deed and for the price of $51,180, it had knowledge of the "fraud" or whether or not it was a pur-

chaser protected by the Registry or whether or not it was a third party.

Insofar as the street is concerned, and there being in the evidence a title deed in favor of the Municipality as to the portion of said street, the judgment appealed from will be set aside, and the case remanded for the trial court to determine, in the light of the evidence which the parties introduce, whether upon acquiring from Luis de la Cruz in 1928 and 1929, the Municipality was a third party protected by the Registry or whether it was a third civil party in good faith. If it is determined that it was an innocent third party, the title of the Municipality over the part of the street should be upheld. Otherwise, the pronouncements made about the Square when the public use and domain ceased shall likewise be applicable thereto.

Pursuant to the stipulation of the parties of February 10, 1964, when the case is remanded the exact area of the lots in litigation shall be determined, and said lots shall be materially delivered to plaintiffs, and the pronouncements concerning the owed fruits since the year 1957, date on which the public use and domain of the property involved ceased, will be made. The trial court shall also fix the attorney's fees in first instance pursuant to the prayer to that effect in the complaint.

Judgment in agreement with all the foregoing pronouncements shall be rendered.

Mr. Justice Hernández Matos, Mr. Justice Blanco Lugo, Mr. Justice Rigau, and Mr. Justice Torres Rigual did not participate herein.